# APPENDIX.

In the Circuit Court for the County of Marion and State of Oregon.

## THE STATE OF OREGON *v.* S. F. CHADWICK, AARON ROSE and B. P. SMITH.

No. 2971—Action to Recover Damages.

*Before Matthew P. Deady, Referee.*

*John M. Thompson and Addison C. Gibbs,* for the plaintiff.

*S. F. Chadwick,* in propria persona, and for Rose and Smith.

The referee having heard the allegations and proofs of the parties and the arguments of counsel in the above entitled case, now finds and states the following conclusions of fact therein:

1. That at the general election held in the month of June, 1870, the defendant, S. F. Chadwick, was duly elected secretary of state for the state of Oregon; and that afterwards, to-wit: on July 15, 1870, said defendant Chadwick, as principal, together with the defendants, Aaron Rose and B. P. Smith, as his sureties, executed and delivered to the plaintiff their certain bond in the penal sum of $10,000 as alleged in the complaint herein to be void among others, upon the performance of the condition following, to-wit: that said Chadwick would "faithfully discharge the duties of his office as secretary of the state of Oregon, and also as auditor," which bond was afterwards, to-wit: on July 19, 1870, duly deposited by said Chadwick, together with his oath of office, in the executive office of said state of Oregon, and then and there duly approved by the governor thereof; and that afterwards, to-wit: on September 12, 1870, said Chadwick by virtue of the premises, entered upon the said office

of secretary of state and remained therein and performed the duties thereof until September 14, 1874.

[The findings of the learned referee are too lengthy for the space left in this volume, but the result of such findings were, in brief, that the defendant, Chadwick, had, while secretary of state, during his first term, audited and allowed, in excess of what was lawful, the following sums to the claimants named, to-wit:

E. F. Foudray, for reclaiming S. E. May, a fugitive from justice, from Salt Lake City, and delivering him to the sheriff of Marion county, the sum of $634 20.

Joseph Sloan, for services as agent of the state, in reclaiming Michael McCormick, a fugitive from justice, from Seattle, W. T., and delivering him to the sheriff of Clackamas county, the sum of $88 00.

J. M. McCoy, for services as the agent of the state, in reclaiming H. L. Palmer, a fugitive from justice, from the state of California, the sum of $149.

Thomas Howard, for services and expenses in arresting upon a bench warrant, E. E. Frink, and conveying him from Grant to Linn county, the sum of $74 46.

J. A. Shinn, the sheriff of Baker county, for conveying one insane person from said county to the insane asylum, $437 60.

T. H. Cann, as assistant secretary of state, the sum of $1,400.

For and on account of clerical aid in the office of secretary of state, the sum of $1,116 78.

W. H. Watkinds, the superintendent of the penitentiary, for conveying two insane persons from said penitentiary to the insane asylum, $15 27.—Rep.]

## OPINION OF THE REFEREE.

The answer in this case, beyond the plea of the statute of limitations, simply denies that the secretary wrongfully audited and allowed the several sums alleged in the complaint, except in the case of Foudray, where there is a further denial of information as to whether he wrongfully charged 107 days for executing the warrant of reclamation or not, but on the trial it was admitted that the return thereon showed that it was done in 26 days and that such was the fact.

It was also substantially admitted on the trial that the several accounts for transportation of convicts and insane alleged in the complaint to have been unlawfully allowed, were allowed under §§ 5 and 6 of the act of January 12, 1859, (Or. L., p. 607) as for the hire and board of a horse, and that there was also allowed for conveying each of such convicts and insane, mileage, at the rate of 10 cents per mile.

Under these circumstances, the answer was considered and treated as a demurrer simply, and the case was tried accordingly.

The plea of the statute of limitations assumes that this action is brought upon a parol contract or liability, and was, therefore, barred in six years from the time the cause of action accrued (Or. code, § 6); whereas it is brought upon a sealed instrument—the bond of the defendants—and the several supposed causes of action stated in the complaint are merely statements of alleged breaches of the condition thereof. Such an action may be brought within ten years from the time it accrued. (Or. code, § 5.) The plea is clearly insufficient.

In the consideration of this case, two principal questions of law arise: (1), What was the compensation allowed by law for reclaiming fugitives and conveying convicts and insane to the penitentiary and asylum; and (2), what is the measure of the secretary's responsibility when acting as auditor of public accounts or claims against the state?

The constitution (§ 2, Art. II) provides that " by virtue of his office" the secretary shall be "auditor of public accounts;" and the statute (Or. Laws, p. 492,) makes it his duty "to *examine* and *determine* the claims of all persons

against the state, in cases where *provision for the payment thereof shall have been made by law*, and to endorse upon the same the amount due and allowed thereon, and from what fund the same is to be paid, and draw a warrant upon upon the treasury for the same."

The statute also provides that "no account shall be audited, except the same be duly verified by the oath  *  *  * of the claimant or his agent;" and authorizes the secretary to examine under oath "the person presenting" an account "orally or in writing as to any fact relating to the justness" of the same. A claimant who is dissatisfied "with the decision of the secretary" may have the matter referred to the legislature; and all claims against the state must be presented to the secretary, with the evidence in support of them, "to be audited, settled and allowed within two years and not afterwards." It will be seen from this that while the secretary is generally a ministerial officer, and not a judicial one, that in the auditing of accounts he acts in a judicial capacity. His duty is to *examine* and *determine* the justness of the account presented and the law applicable thereto. He is to judge of the law and the facts involved in the application. In so doing he is engaged in the exercise of the judicial function as much as though he was sitting on the wool sack.

Still, being a ministerial officer and not a judicial one, he cannot claim the full immunity with which the law in the interest of a "free and impartial administration of justice,  *  *  uninfluenced by fear and unbiased by hope," clothes the judge. (*Taaffe* v. *Downes*, 3 Moore, P. C. 51.) The latter is not answerable *civilly* for any act done in his official capacity, whatever his motives, but the ministerial officer even when acting judicially, is so liable whenever it appears that his act proceeds from or is the result of wilfulness, malice, corruption or gross negligence. In other words, he is responsible for good faith and ordinary care and competency.

In *Pike* v. *Megoun, et al.*, 44 Mo., 491, it was held that the defendants while acting as registration officers were not liable to the plaintiff civilly, for erroneously refusing to register him as a qualified voter, if such error was produced merely by a mistake in judgment, and not as the result of wilfulness, corruption or malice, or " knowingly wrongful and not according to their honest conviction of duty."

In *Walker, et al.* v. *Hallock, et al.*, 32 Ind., 239, it was held that the members of the common council of Evansville were not liable civilly for the consequences of their action in a matter committed by the law to their discretion and judgment—as, for instance, whether or not two-thirds of the adjacent property owners had consented to the continuance of a market house, unless they acted corruptly. In *Weaver* v. *Devendorf*, 3 Denio, 117, it was held that an assessor, in ascertaining and determining the value of taxable property, was acting judicially and therefore was not responsible civilly for the consequences of his action, however erroneous or *whatever his motives*. But, as was said in *Pike* v. *Megoun, supra*, this last remark as to motives, was not necessary to the decision of the case, and being clearly in the face of all the English and American cases upon the point, must be regarded as mere dicta. But the real doctrine of the case—that the assessor in determining the value of property is acting judicially—has been firmly followed by the courts of that state. See *Vail* v. *Owens*, 19 Barb., 22; *Barhyte* v. *Shepherd*, 35 N. Y., 238.

In *Bonner* v. *Adams, et al.*, 65 N. C., it was held that the auditor of the state, whose duty it was, like the defendant Chadwick's in this case, "to examine and liquidate the claims of all persons against the state in cases where there is sufficient provision for the payment thereof;" with power to examine claimants under oath concerning the correctness of such claim—when acting in the performance of this duty was not a mere ministerial officer, but one called upon to pass upon the *correctness* of a claim, and to *judge* if there is "sufficient provision of law for its payment."

It is true, that these decisions were all made in actions brought by private parties for injuries resulting to them from the actions of the officers in question.

But it has not been suggested that the secretary is under any other or different obligation in this matter to the state than the citizen, and I am unable to see why or how he should be, and therefore I think the cases are in point, as much as though the questions decided in them had arisen in proceedings directly between the state and the officer.

It follows from these authorities, and none have been found to the contrary, as well as the reason of the matter, that the secretary of state when acting as auditor of public

accounts and claims against the state is not the mere advocate or agent of the state to prevent the payment of doubtful or unjust claims, but rather the umpire or judge between the citizen and the state, whose duty it is to carefully weigh and examine the fact and the law and allow or disallow the claim according to the fair and reasonable estimation of the one and interpretation and application of the other.

And while it is doubtless his duty to be vigilant to detect and expose false and extravagant claims, and fearless to reject them, it is not his duty to reject or refuse to audit a claim and thereby put the claim to the delay and expense of a petition to the courts for a mandamus or the legislature for relief upon every question or quibble that may be made or suggested concerning its justice or validity. Such a rule of action would practically work a denial of justice to the creditors of the state.

From the very nature of the case, it would be unreasonable, unjust and impracticable to hold the secretary responsible for mere errors and mistakes of judgment committed in the performance of this duty.

Practically, such a rule would seriously impair the usefulness of the office, for who, that would be thought fit for it, would be foolish enough to undertake to audit and pass upon over two hundred thousand dollars of claims, yearly, of all amounts and kinds, and often arising under crude, confused and contradictory legislation, and give bond to be responsible pecuniarily for all mistakes he might make—and that, too, upon the scanty compensation of $1,500 a year?

Acting upon this theory of the duties and responsibilities of the secretary, I have considered and passed upon the demands in the complaint herein, amounting in the aggregate to $5,697 87, and allowed $4,198 01, and disallowed the remainder. The first three involve the question of the compensation of an agent for the reclamation of a fugitive from justice.

The criminal code authorizes the appointment by the governor of an agent to demand such a fugitive of the executive of the state where he may be found. Said code (§ 489) also provides that "The account of the agent, *embracing his actual expenses* incurred in performing the service, must be paid by the state, after being audited and allowed as other claims against the state."

This provision seems to assume what I have no doubt is true, that there need be no difficulty in obtaining a competent agent for this purpose upon the payment of all his expenses. At least it does not provide that he shall have anything else. But it is said there is an implication in the phrase—"*embracing* his actual expenses," that his account may contain a charge for something else.

But unless there is some other statute which may be construed as providing some further compensation, this is not sufficient to justify the payment of anything but expenses, although it may aid in the construction of some other statute to that effect.

§ 13 of the act of October 24, 1864, (Or. Laws, p. 603,) being the general fee bill, provides—that "All private persons performing sevices required by law, or in the execution of legal process, when no express provision is made for their compensation, shall be entitled to $2 for each day so employed, and mileage for any necessary travel, going and returning, at the rate of ten cents per mile." It is not a forced construction of this section to apply it to this agent so far as the per diem is concerned, but there is no reason for such application, so far as the mileage is concerned, that being in its nature only an allowance for traveling expenses which are expressly provided for in § 498, *supra.* Beyond these there is no provision for the compensation or expenses of such agent, nor is there any necessary.

But in the first of these three accounts—that of E. D. Foudray—it was assumed without a particle of authority that he was a sheriff engaged in conveying a convict to the penitentiary on horseback over the mud roads of Oregon, under the act of January 12, 1859—instead of a private person—the mere agent of the executive—traveling swiftly and comfortably by steamer and rail between Salem and Salt Lake, via San Francisco—and allowed to charge mileage for expenses and a per diem of $3 at the rate of one day for every 30 miles of travel whereby the 26 days actually employed were stretched out to 107; and not only this, but the like per diem and mileage for the fugitive, in addition to the sum of $321 for his transportation of 1609 miles—a sum just double the legal mileage or the probable actual cost of such transportation. It might be thought that assumption and ingenuity could go no farther than this, but

35

an item of $101 62 was added for interest during the nine months that the account was lying unaudited in the secretary's office awaiting an appropriation therefor. I have found that at least $634 20 of this account ought not to have been allowed under any circumstances and therefore the defendants are liable for that amount.

Some excuses have been offered for the allowance of this claim, and while they have no legal effect they may not be without weight, morally. The executive volunteered a certificate that the account was "correct," though he could know nothing of it as executive, that the secretary didn't. A committee of the house (H. J. 1872, p. 203,) said that they *believed* the claim "legal and just" and recommended an appropriation to pay it and other like claims "if found just and legal by the secretary." But it should be remarked in·this connection, that the committee seems to have acted upon the prior recommendation of the secretary that an appropriation ought to be made to pay these claims, and that the delay in auditing them was ·caused by the want of such appropriation—all of which implied they were probably legal and just—particularly when there was not a hint or suggestion to the contrary. The other claims for similar services have been disposed of in the same way.

The claims for conveying convicts and insane involve the consideration of sundry statutes extending over many years, including questions of repeal by implication.

In 1855 (act Jan. 19, 1855, Or. L., 1854–5, p. 479,) the law allowed a sheriff for conveying a convict $4 a day— mileage for himself and convict, and the expenses of a guard. In 1859 (act Jan. 12, 1859, Or. L., p. 606,) it was provided that a day's travel in conveying a convict between the first of November and April should be 30 miles, and for the remainder of the year, 36—that a sheriff conveying convicts "on horseback" should be allowed pay for one horse for each convict "at the ordinary rates for horse hire in his county," and that the allowance for conveying convicts "in a wagon or other land vehicle" should not exceed that by horseback. This act, although containing a ·general repealing clause, was not considered to have repealed the provision in the act of 1855, *supra,* giving mileage for the sheriff and convict; and it could not have been so intended, for the board and lodging of the convict would cost at least from $2 to $3 a

day on the road, for which, in that event, the sheriff would get no compensation.

In 1864 (act Oct. 24, 1864, Or. L., p. 603,) the per diem of the sheriff was changed to $3 and the mileage and expense of guards was continued as before. Neither did this act repeal the act of 1859, even if it be admitted that it could have done so, under the constitution, by implication, because in the general repealing act of that year (Oct. 21, 1864, Or. L. 1864, p. 947,) said act was expressly excepted from the repeal, and because it is not to be presumed that it was so intended in the face of the well known fact that the mileage of 10 cents per mile would not, even then, in the greater part of the country, more than pay the transportation of the convict, leaving nothing to reimburse the sheriff for his board and lodging on the road. In the same year (act Oct. 21, 1864, Or. L. 1864, p. 741,) it was provided that the fees and compensation for sheriffs, and others east of the Cascade mountains "in *civil* actions, suits or proceedings" should be one-third more than elsewhere.

I have disallowed Warnick's claim of $276 66 for one-third extra compensation for conveying convicts from east of the mountains, and the like claim of Shinn's of $83 for conveying insane, for the reason that this act did not upon its face apply to any such transaction, being expressly limited to fees and compensation in *civil* suits, etc., and because as to Shinn's case it was expressly repealed by the act of October 29, 1870, (Ses. L., 108,) which by its terms took effect July 1, 1872.

This, I think, is a plain case of oversight or negligence, and the secretary is pecuniarily responsible to the state for the loss resulting therefrom.

In 1872 (act Oct. 23, 1872, Or. L., p. 603,) the fee bill was again revised and the per diem of sheriffs conveying convicts raised to $4, but the provision as to mileage and expense of guards was not changed, nor the act of 1859, *supra*, giving horse hire otherwise affected.

So were the statutes upon this subject during the period covered by this action. Assuming, what was generally understood until the case of *Grant Co.* v. *Sells*, 5 Or., 243, (decided in Dec., 1874,) that under § 22 of art. IV of the constitution a statute could not be repealed or amended by implication, (*Meyer* v. *Cahalin*, 5 Saw., 359,) there would

be no doubt but that a sheriff conveying a convict by land was entitled to the cost of a horse for the transportation of the latter, as well as mileage, because that was the plain letter of the statute. Upon this reasonable conclusion as to the state of the law, the secretary may be presumed to have acted during this period, and although it should turn out afterwards that the law was otherwise, he ought not to be held pecuniarily responsible for this error of judgment.

But I do not think the act of 1859 was even repealed by implication, because no statute passed after it was in the matter of mileage different from the one in force when it was passed. Repeals by implication are not favored; and a mere ministerial officer, though acting judicially, ought not to conclude in favor of such a repeal unless in a very clear case.

The truth is or may be that the country or its means of transportation had outgrown the necessity of the act of 1859, and that since 1870 the mileage was sufficient to transport a convict without the allowance for horse hire. *But that fact would not repeal the act.* It might be a good reason for the legislature doing so; and the law-makers or their advisers may have been remiss in this respect. But the secretary as auditor cannot be made the scapegoat for their sins. But it is not admitted that even now the mileage alone is sufficient to reimburse the sheriff for transporting a convict. Indeed, off the lines of railway and steambeats—probably over two-thirds of the country—I am very certain that it is not. The transportation alone on the overland stage between Roseburg and Jacksonville is now $14 75, and has never been less than $10, or about 10 cents a mile; and still there is the boarding and lodging of the convict, which will amount to $1 50 or $2 a day more.

Assuming, then, that the act of 1859 allowing a horse for the transportation of a convict was in force during the period of these allowances, or that there was reasonable ground for thinking so, the secretary is not personally responsible for allowing horse hire under the name of transportation, in addition to mileage, unless such allowance appears to have been so excessive, under the circumstances, as to warrant the belief that it was made without reference to the law—wilfully, or without sufficient care.

In Klippel's case there was an allowance of $153 for the

transportation of 3 convicts—the distance traveled, going and returning, being according to the statute, 490 miles. At 30 miles a day's travel, this allowance would be within a very small fraction of $2 75 a day, for a horse, rigging and board, which probably could not be had for less. Taking this allowance as a standard established by the secretary himself, in this and the two Wright cases, I found that the allowances for transportation or horse hire in excess of this rate were unauthorized and the result of wilfulness or insufficient care, and held the secretary responsible for the damage to the plaintiff.

In Watkind's case, it is more than doubtful if he was authorized to convey the insane convict to the asylum at all. § 7 of the act of September 27, 1862, (Or. Laws, p. 622,) did authorize the governor to cause an insane convict to be removed to the asylum, and it was under this authority that Watkinds probably acted. But by § 1 of the act of October 28, 1868, (Or. Laws, p. 623,) it was made "the duty of the sheriffs of the several counties," to convey to the asylum such persons as may be duly declared insane. As the convict in question was removed in 1872, it would seem that the service should have been performed by the sheriff. But waiving this, there is no law providing for the payment of removing an insane convict by the governor, and therefore the most that can be charged is what is reasonable under the circumstances, or $2 a day and mileage for the agent, under § 14 of the act of October 24, 1864, (Or. L., p. 605,) and expenses of transporting the convict.

But the person employed being the superintendent of the penitentiary, employed by the state upon a yearly salary, it was not reasonable nor proper that he should receive a per diem of $9 for going from Salem to Portland and back on the railway. As for the charge of interest in this and $9 17 in Shinn's case of October 23, 1872, whatever other objection there may have been to the payment of them, it is sufficient to say, that there was no law for it. It is an elementary principle that the state never pays interest unless expressly required to do so, and therefore it is difficult to say why these items were allowed, unless their smallness secured them from criticism.

These remarks apply also to the item of interest allowed in Foudray's case; but as the plaintiff in the action has

allowed the interest upon the sum admitted to be due Foudray, I have not made any question about it.

The next item is the allowance of $1,400 for an assistant secretary of state when there was no such officer.

By §§ 8 and 9 of the Or. Laws, p. 491, the secretary is authorized in his discretion, to appoint an assistant, who shall receive an annual salary of $400 a year "to be audited and paid for as the salaries of state officers."

In this case, the appointment having been overlooked or omitted for some reason, technically it was a plain violation of law to audit and allow an account for such services; and the plaintiff is therefore entitled to recover the amount back from the secretary. At the same time, it being always well understood that this assistant secretaryship, with its annual pittance of $400, was given to the secretary as a means of eking out his little salary, and that it was expected that he might make a nominal appointment of some boy or person otherwise employed, and do the work and receive the compensation himself, it is not probable that the legislature will refuse to relieve against this technical liability. It is not necessary to add, that such an arrangement is not up to the very highest standard of political morality, but it is just such a fetch as cheap governments have always been compelled to resort to.

The next and last item is the illegal allowance of $1,116 78 as "clerical aid."

In 1870 (act Oct. 26, 1870, Or. L., p. 494,) it was provided that the secretary should have $400 a year for clerical aid in his office, to be paid quarterly on his warrant. In 1872 (act Oct. 22, 1872, *id.*,) it was provided that this allowance should be $1,000 per annum. This latter act contained a preamble to the effect that the large increase of work in the department required a large increase of force, but it made no illusion to the act of 1870, and contained no express repeal of it.

From all the circumstances—particularly the great difference between $400 and $1,000—there is no reasonable doubt but that the legislature *intended* the latter act and sum to take the place of the former one. But acting upon what was supposed to be the legal effect of § 22 of art. IV of the constitution upon the amendment of statutes, as above stated, the compiler placed both acts in the compila-

tion of 1874, as being in force irrespective of the supposed intention of the legislature. But the supreme court having since held (*Grant Co.* v. *Sells, supra,*) that a statute may be repealed by implication, notwithstanding the constitution, it follows that the act of 1872 repealed and displaced that of 1870. In *Pierpont* v. *Crouch,* 10 Cal., 315, an act of the legislature having fixed the salary of the district attorney at $1,000 a year, two years thereafter another act was passed without in any way referring to the former one, fixing it at $600; the court per Field, J., held that the latter act repealed the former one, because it was clearly evident that "it was intended as a revision or substitute of it." This case is *quatuor pedibus* with the case at bar.

The secretary, acting upon the assumption that both acts were in force by the operation of the constitution irrespective of the supposed intention of the legislature, drew both sums and has not accounted for them otherwise than by an allegation in his answer, that "the state had the benefit of the money"—therefore he is legally liable for the amount claimed—the excess over $1,000. If it appeared, however, that the secretary had expended this money in clerk hire in his office, I should have no hesitancy in holding that it was such a mistake in judgment as excused him from personal responsibility for it. But instead of alleging in his answer that he drew the money and expended it for clerk hire and producing the vouchers or testimony in support of it, he merely alleges that the state got the benefit of it, and makes no attempt to prove it. This appropriation for clerical aid could not be lawfully drawn by the secretary except to pay for clerical labor in his office performed, not by himself, but by third persons whom he found it necessary to employ for that purpose. For his own services, the secretary is supposed to be compensated by his salary. But if the fact is as it should be, that the money was expended for clerical aid in the service of the state, make no doubt but that the legislature will grant the secretary relief.

As there is no specific claim for interest in the complaint and nothing was said by counsel on the subject, I have made no finding upon the subject. If interest is given, it should be allowed at least from September, 1874, to date.

Interest for 4 years upon the sum found due would be $1,691 60, which added to the principal would make $5,920 60.